HEARING DATE: JUNE 24, 2026 AT 2:00 P.M.

John P. Amato, Esq.
Joshua I. Divack, Esq.
Joseph V. De Santis, Esq.
**THOMPSON COBURN LLP**
488 Madison Avenue, 15th Floor
New York, New York 10022
(212) 478-7200
jamato@thompsoncoburn.com
jdivack@thompsoncoburn.com
jdesantis@thompsoncoburn.com

*Attorneys for White Oak Commercial Finance, LLC*
*and White Oak ABL 3, LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re

      501 Jersey Avenue, LLC

               Debtor.

-------------------------------------------------------------X

Chapter 11

Case No. 26-41683 (JMM)

**REPLY TO DEBTOR'S OBJECTION TO MOTION OF SECURED CREDITORS WHITE OAK ABL 3, LLC AND WHITE OAK COMMERCIAL FINANCE, LLC FOR AN ORDER DIRECTING THE DEBTOR'S INSIDER AND HOLDOVER TENANTS TO BE REMOVED FROM THE DEBTOR'S PROPERTY AND SOLE ASSET UNDER 11 U.S.C. §§ 105(a) AND 363 OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)(1)**

TO:    THE HONORABLE JIL MAZER-MARINO,
       UNITED STATES BANKRUPTCY JUDGE:

    1.     White Oak ABL 3, LLC ("WO ABL") and White Oak Commercial Finance, LLC ("WOCF") (collectively, "White Oak"), by their attorneys, Thompson Coburn LLP, submit this reply to debtor 501 Jersey Avenue LLC's (the "Debtor") June 19, 2026 objection (the "Objection") [ECF No. 15] to White Oak's motion for entry of any order:

        a.   pursuant to 11 U.S.C. (the "Bankruptcy Code") §§ 105(a) and 363, directing the Debtor's insider, holdover tenants—Fame Fashion House LLC ("Fame") and S3 Holding LLC ("S3") (collectively, the "Tenants")—to immediately vacate the Debtor's real property and commercial warehouse located at 501

Jersey Avenue, New Brunswick, New Jersey 08901 (the "Property"), so that the Property may be sold free and clear of liens, claims, and encumbrances in a manner that maximizes its value for the benefit of the Debtor's estate and creditors; or

b.  in the alternative, pursuant to 11 U.S.C. § 362(d)(1), modifying the automatic stay to permit White Oak to take any and all action necessary to lawfully evict, dispossess, or otherwise remove the Tenants and any other occupants or holdovers from possession, occupancy, or use of the Property, and to extinguish any and all contractual, legal, or equitable rights, claims, or interests they may assert with respect to the Property; and

c.  granting such other and further relief as may be just and proper (the "Motion") [ECF No. 10].

## REPLY ARGUMENT[1]

2.      The Objection utterly fails to justify the insider Tenants' occupancy of the Property, ignoring that White Oak terminated the Lease in January 2026 after the Tenants failed to cure their payment defaults and that the Tenants are unlawful holdovers occupying the Property rent-free. The Debtor has a fiduciary obligation to protect the estate and its creditors, and the Tenants' occupancy will materially diminish the Property's marketability and sale value. While the Objection purports that the Property may be more valuable with the non-paying holdover Tenants in place, it provides no broker opinion, as the Court specifically requested at the Initial Case Conference. In fact, the Debtor recently listed the Property for sale as vacant and was apparently offered $46,000,000 in an unsigned letter of intent (from the same buyer who failed to close in 2023). This is a far cry from the $62.8 million Property valuation attested to in the Petition. Even still, the Debtor objects to removing the Tenants because Joseph Saadia ("Saadia"), the beneficial owner and member of both the Debtor and Tenants, is plainly acting in his own self-interest, not the estate's.

---

[1]  Capitalized terms used but not defined shall have the meanings ascribed to them in the Motion and supporting Declaration of John P. Amato, Esq. (the "Amato Declaration") [ECF No. 12].

3.      The Debtor's motivation is transparent. Saadia intends to file additional bad-faith bankruptcy cases, this time on the Tenants' behalf, invoking the automatic stay to deliberately frustrate and delay creditors' recovery. This pattern is not new. In the related case, *In re 5200 KH LLC*, Case No. 1-26-40998-JMM (Bankr. E.D.N.Y.), this Court modified the automatic stay after that Saadia-owned debtor failed to file a bid procedures and sale motion in accordance with the Court's April 12, 2026 Order Granting Conditional Relief from the Automatic Stay. The same bad faith is at work here, and the Debtor has no genuine intention of maximizing value for creditors or proceeding to a sale.

4.      To advance the sale process in good faith, however, White Oak would agree to a provisional resolution of the issues raised by the instant Motion and to adjourn or withdraw without prejudice the instant Motion, if the Court were to enter an order (a) requiring the Debtor to file a bid procedures and sale approval motion no later than June 30, 2026, pursuant to which the Court would schedule a bid procedures hearing, an auction, and a sale approval hearing, and set an outside date for the closing of an approved sale to occur within the next ninety days, time being of the essence, and (b) provide that the Debtor's failure to meet such milestones and conditions would result in the conversion of this case to a case under Chapter 7 of the Bankruptcy Code.  The bid procedures order would, among other things, (a) specify that the Debtor must cause the Property to be timely delivered at the sale closing free and clear of any occupancies, unless otherwise agreed to in writing by the bidder whose bid is approved by the Court as highest and best, and (b) recognize White Oak as a presumptively qualified bidder entitled to credit bid.  In consideration, White Oak would agree to credit bid the full amount of the first and second mortgage debt held by it (more than $43.6 million) as the initial bid at such auction, and would agree to forbear without prejudice from seeking

3

additional relief from the automatic stay under 11 U.S.C. § 362(d)(3) during the pendency of the sale process as scheduled by the Court.  Accordingly, the bid procedures need not await or contemplate a stalking-horse bidder whether Elion (as defined below) or otherwise.

5.      Notwithstanding, the Debtor's Objection to the Motion is meritless for the reasons stated below.

## I.      THE MOTION WAS FILED IN ACCORDANCE WITH THE COURT'S DIRECTION

6.      The Debtor's argument that the Motion was "short served" is meritless and ignores the procedural history of this case. At the Initial Case Conference on May 27, 2026, the Court scheduled the Status Hearing for June 24, 2026, with the agreement of all counsel and understanding that the parties would use the intervening period to file their respective motions, including this motion and the Debtor's bid procedures and sale motion (which remains outstanding), and address any other substantive matters.

7.      Likewise, given the Debtor's contention that the Property could be more valuable with the non-paying holdover Tenants in place, the Court requested that the Debtor be prepared with broker testimony on the issue at the Status Hearing.

8.      The Debtor cannot credibly complain about the timing of this Motion when the Debtor had advance notice of the Motion, a full and fair opportunity to interpose the Objection, and it was the Debtor's own breach of its fiduciary obligations that made this Motion necessary.

## II.     THE DEBTOR FAILS TO REFUTE THAT THE TENANTS ARE UNLAWFUL HOLDOVERS CAUSING HARM TO THE ESTATE

9.      The Objection completely ignores the fact that the Tenants' Lease was terminated in January 2026. On December 15, 2025, White Oak served the Notice of Default and Demand for Rent Payment (the "Default Notice") on both Tenants, informing them of

4

their payment defaults and demanding that they cure within thirty (30) days. *See* Amato Declaration, Ex. 11. The Tenants received the Default Notice on December 22, 2025, as confirmed by signed certified mail receipts, and failed to cure within the prescribed 30-day period under Section 13.1 of the Lease. *See* Amato Declaration, Ex. 12. After the cure period expired on January 21, 2026, the Lease was terminated, and the Tenants became unlawful holdovers.

10.    Since October 2025, the Tenants have failed to remit any payments to White Oak for their use and occupancy of the Property, representing no less than $599,999.94 in unpaid rent, exclusive of additional rent, late fees, and other charges. *See* Amato Declaration, Ex. 5.

11.    Crucially, the Tenants are affiliated insiders of the Debtor with no legitimate possessory interests in the Property since the Lease terminated. *See Radol v. Centeno*, 165 Misc. 2d 448, 451 (Civ. Ct. Queens Cnty. 1995) (explaining that "New York law knows of no lingering interest of an occupant in the premises, 'equitable,' 'residual' or otherwise, after the occupant's right of possession has been terminated," and that, "where there is no landlord-tenant relationship, the automatic stay under 11 U.S.C. [§] 362 is inapplicable"). The Tenants are Saadia's own entities, over which he exercises total control, and who are also judgment debtors of White Oak. Their occupancy of the Property is solely for Saadia's personal benefit, not for the benefit of the estate or its creditors. As such, they deserve no protection from this Court.

12.    The Debtor, as a debtor in possession, owes a fiduciary obligation to "be accountable for all property received" and to act in the best interest of the estate and its creditors. *In re STN Enterprises*, 779 F.2d 901, 904 (2d Cir. 1985); *In re Advanced Contracting*

5

*Sols., LLC*, 582 B.R. 285, 304 (Bankr. S.D.N.Y. 2018) ("As fiduciaries, the debtor-in-possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate."). The Debtor, by permitting its insider Tenants to occupy the Property rent-free, is actively breaching this obligation and causing a continuing diminution of the estate to the detriment of all creditors. *See In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (citing *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate.").

### III.    THE DEBTOR FAILS TO OFFER ANY EVIDENCE THAT THE TENANTS' OCCUPANCY DOES NOT DIMINISH THE PROPERTY'S VALUE, AS THE COURT REQUESTED AT THE INITIAL CASE CONFERENCE

13.    The Objection makes the specious argument that "the existence of the [T]enants may in fact increase the value of the real property, because a prospective purchaser may want the leases as they currently are drafted or could renegotiate with the tenants as part of a purchase." ECF No. 15 ¶ 14. This assertion is baseless and unsupported.

14.    First, there is no lease to "want." The Lease terminated in January 2026. Any notion that a buyer would desire an expired lease with non-rent-paying insider Tenants that are unlawful holdovers is absurd.

15.    Second, and more tellingly, the Debtor has failed to produce any testimony or evidence, as the Court requested at the Initial Case Conference, to support its claim that the Tenants' presence does not diminish the Property's value. The Debtor has not offered testimony from any broker or real estate professional that the Property's marketability or value is preserved—let alone enhanced—by the continued presence of unlawful holdover tenants. This should not have been difficult to obtain, if it were true, since the Debtor has listed the

6

Property with NAI Global. *See* Amato Declaration, Ex. 14. The absence of such testimony is telling, particularly when the burden has shifted to the Debtor to "go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected." *See In re Elmira Litho Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

16.     The Debtor's own marketing materials contradict its argument. The marketing materials with NAI Global state that the Property will be delivered vacant of the Tenants. *See* Amato Declaration, Ex. 14. If the Tenants' occupancy truly enhanced the Property's value, one would expect the marketing to tout—not hide—their presence. The Debtor cannot simultaneously market the Property as vacant-delivery to prospective purchasers while arguing to this Court that the Tenants add value.

## IV.     <u>WHITE OAK IS NOT FULLY SECURED AT THE PROPOSED SALE PRICE</u>

17.     The Debtor's assertion that White Oak's secured positions would be completely covered by the $46 million contingent proposal is incorrect. White Oak's combined secured indebtedness alone, comprising WO ABL's first-priority mortgage claim in excess of $23.4 million and WOCF's second-priority mortgage claim in excess of $20.2 million, totals more than $43.6 million. When combined with the outstanding real estate tax obligations—including a $1,266,200 first-priority tax lien held by ATCF II New Jersey, LLC and approximately $1.75 million in outstanding 2025 real estate taxes—the total exceeds $46 million before accounting for accrued interest, late fees, attorneys' fees, and other charges. This calculation does not even address the claims of other secured and unsecured creditors, including the $15,002,876.22 fourth-priority claim of Davidson 2005, LLC, or the eight unsecured claims totaling $6,158,647.94, according to the Petition.

18.     Accordingly, White Oak is not oversecured by the $46 million offer. To the contrary, a sale at that price would leave White Oak undersecured, confirming the absence of an adequate equity cushion and reinforcing the need for the relief sought in the Motion. *See In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 749 (Bankr. S.D.N.Y. 2004) ("Even when a slight equity cushion exists, this does not constitute adequate protection where post-petition interest is accruing, and the debtor is not able to pay expenses as they come due.").[2]

## V.      AMPLE CAUSE EXISTS FOR STAY RELIEF INDEPENDENT OF THE *SONNAX* FACTORS, WHICH ARE NOT ALL-INCLUSIVE OF "CAUSE" UNDER § 362(d)(1)

19.     The Debtor devotes the bulk of its Objection to the twelve-factor test set forth in *In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990). But the *Sonnax* factors are not the exclusive measure of "cause" under § 362(d)(1). The term "cause" is intentionally undefined in the Bankruptcy Code, and courts determine whether cause exists on a case-by-case basis. *See Sonnax*, 907 F.2d at 1286; *In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 748 (Bankr. S.D.N.Y. 2004). The *Sonnax* factors were developed specifically to guide courts in determining whether to lift the automatic stay to permit the continuation of pending litigation in another forum. *See Sonnax*, 907 F.2d at 1286. They do not define, let alone exhaust, what constitutes "cause" for stay relief in all contexts.

20.     Here, White Oak has established cause for stay relief on multiple independent grounds that exist entirely apart from the *Sonnax* framework: (i) the Debtor's bad faith filing, as evidenced by the timing of the Petition, Saadia's pattern of serial filings, and the Debtor's

---

[2]  White Oak's reliance on these facts should not be misunderstood as a request for broad stay relief for all enforcement purposes based solely on lack of adequate protection. The Motion seeks limited, targeted relief, and these facts are relevant because they confirm that the Debtor's continued possession and use of the Property, without payment or a viable path to cure, independently supports a finding of "cause" under section 362(d)(1).

8

failure to take any meaningful steps toward reorganization or sale; (ii) the lack of adequate protection, given nine months of unpaid rent and occupancy charges, no post-petition payments to White Oak, accruing interest and taxes, only $39,000 remaining in the DIP account as of the § 341 meeting, and no apparent way for the Debtor to generate income; (iii) the Debtor's refusal to provide White Oak with the demanded accounting; and (iv) the Debtor's (and, in fact, the Tenants') irrevocable pre-petition consent to, and waiver of, the right to oppose stay relief under Section 5.3 of the Settlement Agreement (*see* Amato Declaration, Ex. 14). Each of these grounds independently constitutes "cause" under § 362(d)(1) and none depends on the *Sonnax* factors. The Objection does not address these arguments.

21.     Moreover, even if the Court were to apply the *Sonnax* factors, they favor White Oak. As the Objection itself concedes, "not all of the *Sonnax* factors are relevant in every case, and the court need not assign equal weight to each factor." ECF No. 15; *see Sonnax*, 907 F.2d at 1286; *see also In re Anton*, 145 B.R. 767, 770 (Bankr. E.D.N.Y. 1992).

22.     As to factor (1), whether relief would result in resolution of the issues, the removal of the unlawful holdover Tenants is a discrete and straightforward remedy that would immediately enhance the Property's marketability and sale value, as the Debtor's own marketing materials confirm.

23.     As to factor (2), the Tenants' occupancy is not merely connected to the bankruptcy case—it is the primary impediment to the Debtor's stated goal of selling the Property for the highest value. The Tenants' removal furthers, rather than interferes with, the administration of this case.

9

24.     As to factor (6), whether the action primarily involves third parties, the Debtor concedes that the Writ of Possession targets third parties—the Tenants—but argues that their removal "could have a significant impact on the Debtor's case." Under traditional *Sonnax* analysis, however, the more that the requested relief is directed at third parties rather than the debtor itself, the less it interferes with the debtor's reorganization. The Tenants are not the Debtor. They are separate entities with no legitimate possessory interest in the Property since the Lease terminated. Removing them does not dispossess the Debtor of anything. To the contrary, it enhances the marketability and sale value of the Debtor's sole asset for the benefit of the estate and all creditors.

25.     As to factor (7), the Debtor claims that "all creditors of the Debtor's estate will be prejudiced by stay relief." The opposite is true. The estate's creditors are prejudiced by the continued rent-free occupancy of the Property by the Debtor's affiliated insider Tenants for Saadia's personal benefit, which depresses the Property's value and generates no income for the estate. Removing the Tenants allows the Property to be marketed and sold on a vacant-delivery basis, as the Debtor itself has advertised, thereby maximizing returns for all creditors.

26.     As to factor (10), the interests of judicial economy and the expeditious resolution of litigation, the Debtor argues that stay relief would lead to "protracted state court activity." This mischaracterizes the procedural posture. There is nothing left to litigate. The Lease was terminated in January 2026 after the Tenants failed to cure their defaults. The state court already granted the Writ of Possession on April 7, 2026, naming the Tenants and directing the Middlesex County Sheriff to remove them from the Property. The only thing that halted enforcement was the Debtor's bankruptcy filing the very next day. This is not a situation requiring lengthy litigation in another forum. It is rather a situation requiring the

10

execution of relief already granted. Moreover, if the Court proceeds under §§ 105(a) and 363, the primary relief sought in the Motion, there is no need to return to state court at all. This Court can resolve the issue in a single order, which is the most judicially economical outcome available.

27.    As to factor (12), the balance of harms, the Debtor has not identified any legitimate harm that would result from the Tenants' removal. The Tenants are Saadia's entities, which have no ongoing operations at the Property, and the Lease has been terminated. Meanwhile, the Property's value continues to erode through accruing interest, unpaid taxes, and the ongoing suppression of its market value.

## VI.    THE UNSIGNED LOI IS A DILATORY TACTIC, NOT EVIDENCE OF ADEQUATE PROTECTION

28.    The Debtor attached as Exhibit A to its Objection a letter of intent from Elion Acq, LLC ("Elion") reflecting a preliminary purchase price of $46 million (the "LOI"). Far from supporting the Debtor's position, the LOI raises serious concerns and presents nothing more than a dilatory tactic.

29.    First, this is not a new buyer. Upon information and belief, Elion is Saadia's and his brother Jack's proxy and was previously used to obstruct White Oak's recovery of its debt. Indeed, as part of WOCF's loan facility with the Saadia group, WOCF entered into the 10th Amendment to the applicable loan agreement and extended forbearance, among other things, in contemplation of a $15,000,000 sale of the Property to Elion to close by November 30, 2023, and a corresponding $15,000,000 cash payment to White Oak. Upon information and belief, Elion conducted full due diligence on the Property in connection with that transaction, yet nevertheless failed to close despite an executed Purchase and Sale Agreement between the Debtor and Elion dated as of September 7, 2023. It can only be concluded that

the then-pending "Elion sale" was never intended to close. Instead, the proposed deal was used to delay and defraud White Oak. Now, years later, the same buyer reappears with an unsigned LOI requiring another 30 days of due diligence on a Property it has already fully investigated, after which it can simply cancel the deal and walk away, leaving no deposit, no commitment, and no binding obligation of any kind. The LOI itself states that, except for confidentiality and exclusivity, "it is not intended to impose any obligation whatsoever on either party" and that "neither party may reasonably rely on any promises inconsistent with this paragraph." This is not a bona fide offer. It is a device designed to allow the insider Tenants to continue occupying the Property rent-free while the estate's value erodes.

30.     Second, the LOI's terms contemplate the Property as sold vacant. The LOI's closing conditions require the purchaser's receipt of tenant estoppels, and the Debtor's marketing materials advertise the Property as delivered vacant. The Debtor cannot simultaneously market the Property as vacant-delivery to prospective purchasers while arguing to this Court that the Tenants add value.

31.     Third, even taking the $46 million purchase price at face value, the LOI does not demonstrate that White Oak is adequately protected. As set forth above, White Oak's combined secured indebtedness, together with outstanding real estate taxes, exceeds the proposed purchase price. If this unsigned, non-binding LOI is allowed to run its course with thirty (30) days of due diligence, followed by an additional forty-five (45) days to close, assuming Elion does not simply walk away, White Oak will be at square one in mid-August with no deal and yet another month of unpaid and accruing interest, all while the insider Tenants continue to occupy the Property rent-free.

12

## VII.    WHITE OAK'S GOOD-FAITH PROPOSAL

32.    As an alternative, White Oak proposes in good faith that the Debtor file its bid procedures and sale motion within five (5) days of the Status Hearing on June 24, 2026: (a) specifying that the Debtor will cause the Property to be delivered free and clear of any occupancies, unless otherwise agreed in writing by the high bidder at the sale approval hearing, and (b) scheduling a bid procedures hearing, an auction, a sale hearing, and a closing at specified dates to all occur within the next ninety (90) days. White Oak will be entitled to credit bid and will commit to do so as an opening bid so that no stalking horse bid from a third party is necessary and no breakup fee or bid protection to any bidder is necessary. All other bid terms and conditions can be set by the Court at the bid procedures hearing. The Debtor's failure to meet any dates or conditions would result in the conversion of this case from Chapter 11 to Chapter 7. While this occurs, White Oak would refrain from seeking any additional relief under 11 U.S.C. § 362(d)(3) on a non-prejudice basis.

### CONCLUSION

33.    Accordingly, White Oak respectfully requests that this Court grant its Motion:

a.    pursuant to 11 U.S.C. §§ 105(a) and 363, directing the Debtor's insider, holdover Tenants—Fame and S3—to immediately vacate the Property, so that the Property may be sold free and clear of liens, claims, and encumbrances in a manner that maximizes its value for the benefit of the Debtor's estate and creditors; or

b.    in the alternative, pursuant to 11 U.S.C. § 362(d)(1), modifying the automatic stay to permit White Oak to take any and all action necessary to lawfully evict, dispossess, or otherwise remove the Tenants and any other occupants or holdovers from possession, occupancy, or use of the Property, and to extinguish any and all contractual, legal, or equitable rights, claims, or interests they may assert with respect to the Property; or

c.    in the further alternative, entering an order providing for a provisional resolution of the issues raised by the Motion, pursuant to which White Oak would adjourn or withdraw the Motion without prejudice, requiring the Debtor to file a bid procedures and sale approval motion no later than June 30, 2026,

13

scheduling a bid procedures hearing, an auction, and a sale approval hearing, and setting an outside date for the closing of an approved sale to occur within ninety (90) days, time being of the essence. Such order should further provide that the bid procedures order will, among other things, (i) require the Debtor to cause the Property to be timely delivered at closing free and clear of any occupancies, unless otherwise agreed in writing by the bidder whose bid is approved by the Court as highest and best, and (ii) recognize White Oak as a presumptively qualified bidder entitled to credit bid. In consideration, White Oak would agree to credit bid the full amount of the first and second mortgage debt held by it, totaling more than $43.6 million, as the initial bid at such auction, and would forbear without prejudice from seeking additional relief from the automatic stay under 11 U.S.C. § 362(d)(3) during the pendency of the Court-approved sale process. The bid procedures therefore need not await or contemplate a stalking-horse bidder, whether Elion or otherwise. The Debtor's failure to meet any such milestones or conditions would result in the conversion of this case to a case under Chapter 7 of the Bankruptcy Code; and

d.  granting such other and further relief as may be just and proper.


Dated: New York, New York
        June 23, 2026

**THOMPSON COBURN LLP**


By: */s/ John P. Amato*
    John P. Amato, Esq.
    Joshua I. Divack, Esq.
    Joseph V. De Santis, Esq.
    488 Madison Avenue
    New York, NY  10022
    Telephone: 212-478-7200
    jamato@thompsoncoburn.com
    jdivack@thompsoncoburn.com
    jdesantis@thompsoncoburn.com

    *Attorneys for White Oak ABL 3, LLC and*
    *White Oak Commercial Finance, LLC*

## CERTIFICATE OF SERVICE

I certify that on June 23, 2026, I caused the foregoing Reply brief in connection with the Motion of Secured Creditors White Oak ABL 3, LLC and White Oak Commercial Finance, LLC for an Order Directing the Debtor's Insider and Holdover Tenants to Be Removed From the Debtor's Property and Sole Asset Under 11 U.S.C. §§ 105(a) and 363 or, in the Alternative, Granting Relief From the Automatic Stay Under 11 U.S.C. § 362(d)(1) to be served upon all registered participants by electronically filing the same with the Clerk of Court via the ECF system.

Dated: New York, New York
June 23, 2026

**THOMPSON COBURN LLP**

By:    */s/ John P. Amato*
John P. Amato
Joshua I. Divack
Joseph V. De Santis

488 Madison Avenue
New York, New York 10022
(212) 478-7200
jamato@thompsoncoburn.com
jdivack@thompsoncoburn.com
jdesantis@thompsoncoburn.com

*Attorneys for White Oak ABL 3, LLC and
White Oak Commercial Finance, LLC*